# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A25-0205

Moline Machinery, LLC, et al.,
Appellants,

vs.

City of Duluth,
Respondent.

**Filed September 8, 2025**
**Affirmed in part, reversed in part, and remanded**
**Frisch, Chief Judge**

St. Louis County District Court
File No. 69DU-CV-21-1668

Shawn M. Raiter, Matthew B. Bolt, Larson • King, LLP, St. Paul, Minnesota; and

Jerome D. Feriancek, Northland Trial Team, Duluth, Minnesota (for appellants)

Terri L. Lehr, Duluth City Attorney, Elizabeth Sellers Tabor, Assistant City Attorney, Duluth, Minnesota (for respondent)

Paul A. Merwin, Patricia Y. Beety, League of Minnesota Cities, St. Paul, Minnesota (for amicus curiae League of Minnesota Cities)

Considered and decided by Wheelock, Presiding Judge; Frisch, Chief Judge; and Halbrooks, Judge.[*]

## SYLLABUS

1.    For purposes of a claim of unjust enrichment, a person or entity is enriched upon receipt of a benefit.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

2.     A city acting in its legislative capacity in establishing stormwater utility fees is entitled to judicial deference.

3.     To withstand summary judgment on an unjust-enrichment claim that challenges municipal stormwater utility fees, a plaintiff must produce evidence that (a) a reasonable fact-finder could conclude clearly and convincingly rebuts the presumption of just and reasonable rate-design decisions and (b) establishes a genuine dispute of material fact as to whether a municipality unjustly retained fees.

**OPINION**

**FRISCH**, Chief Judge

Appellants are a certified class of nonresidential property owners who challenge the summary-judgment dismissal of their claims seeking the return of allegedly excessive stormwater utility fees charged by respondent City of Duluth.  Appellants assert that the district court erred by determining as a matter of law that (1) the city was not unjustly enriched and (2) the collection of fees did not amount to a governmental taking under the Minnesota Constitution.  We affirm the summary dismissal of the takings claim.  But we conclude that the district court erred in determining that no enrichment occurred as a matter of law.  We also conclude that, even affording judicial deference to the city's rate-design decisions, appellants satisfied their burden to produce evidence that a reasonable fact-finder could conclude establishes that the city unjustly retained some amount of stormwater utility fees.  We therefore reverse and remand for further proceedings consistent with this opinion on the unjust-enrichment claim.

**FACTS[1]**

Pursuant to statute and city code, the city operates a stormwater utility and imposes user fees on residential and nonresidential property owners to fund its operation and maintenance. *See* Minn. Stat. § 444.075 (2024); Duluth, Minn., City Code (DCC) § 43-66 (2012). The purpose of the stormwater utility is to effectively manage stormwater runoff. DCC § 43-64 (1998).

***Establishment of Stormwater Utility***

In 1998, the city established its stormwater utility. DCC § 43-63 (1998). The city had previously retained environmental engineering firm Camp Dresser & McKee (CDM) to help create the utility. CDM ultimately issued a report with recommendations for establishing the structure, funding, and budgeting of the stormwater utility, including recommendations for developing "an adequate funding method that can cover the cost of storm water management with an equitable yet cost-effective rate structure." The city adopted many of these recommendations, including CDM's proposal for funding the utility.

***The City's Methodology for Calculating Monthly Stormwater Utility Fees***

The city charges stormwater utility fees "based upon the amount of impervious area on the benefitting property." DCC § 43-66 (2020). The city calculates user fees for a given property by reference to a base unit known as an equivalent residential unit (ERU). *Id.* The ERU value is "[t]he average impervious area of residential property per dwelling unit

---

[1] The following facts are based on the summary-judgment record and, unless otherwise noted, are undisputed.

located within the city." DCC § 43-65 (2020). A "dwelling unit" is "[a] single unit that provides complete, independent living facilities for one or more persons including permanent provision for living, sleeping, eating, cooking and sanitation." *Id.* The city includes single-family, multifamily, townhome, condominium, and mobile-home residences in its definition of "dwelling unit." To produce an initial ERU value upon commencement of the utility's operation, the city determined the average impervious surface area of single-family, multifamily, townhome, condominium, and mobile-home residences, and it then factored in the overall number of dwelling units across each category of residential unit. This analysis produced an ERU value of 1,708 square feet.

As part of its billing methodology, the city uses an ERU rate set by the Duluth Public Utilities Commission. *Id.* The ERU rate is the "utility fee charged on each ERU," DCC § 43-65, and that rate must be "sufficient to produce revenue equal to the budget of the stormwater utility," DCC § 43-66(c).

The city uses a different formula for calculating the monthly stormwater fees, depending on whether a property is residential or nonresidential. *Id.* (b). For residential properties, the monthly utility fee is "the ERU rate multiplied by the number of dwelling units existing on the property." *Id.* (b)(1). But for nonresidential properties, the monthly utility fee is the ERU rate multiplied by the number of ERUs for a given property. *Id.* (b)(2). To determine the number of ERUs for a nonresidential property, the city divides the square footage of impervious surface area for that parcel by the ERU value. DCC § 43-66. For example, using an ERU value of 1,708 square feet, a nonresidential property with 20,000 square feet of impervious surface would be assigned 11.7 ERUs.

4

The number of assigned ERUs is then multiplied by the ERU rate to calculate the monthly stormwater fees for that property. For example, using a hypothetical ERU rate of $5, the monthly stormwater charge for a nonresidential property assigned 11.7 ERUs would be $58.50.

### The Stormwater Utility Budget

The city sets the stormwater utility budget annually based on the amount of revenue expected to be generated by stormwater fees. Such fees do not generate a profit. Instead, the city "uses a zero-sum billing system," in which the money generated from stormwater fees is used "only for stormwater-related expenses."

### The City Reevaluates its ERU Value

The ERU value remained unchanged from the inception of operations until 2021. At that time, the city hired engineering firm Short Elliott Hendrickson, Inc. (SEH) to reevaluate the ERU value using updated impervious surface area measurements provided by the city. SEH initially issued a report that calculated a new ERU value of 3,099 square feet. But the city rejected this calculation because SEH considered the impervious surface area of only single-family homes rather than the impervious surface area of all types of dwellings that, the city maintained, included single-family, multifamily, townhome, condominium, and mobile-home residences. The city instructed SEH to recalculate the ERU value accordingly. SEH issued an updated report in 2022, calculating the ERU value at 2,228 square feet. The city adopted SEH's revised calculation, and the new ERU value went into effect on January 1, 2023.

5

*The Present Litigation*

In 2021, appellants—nonresidential property owners—commenced this class action asserting, as pertinent to this appeal, claims for unjust enrichment and unlawful taking. Appellants alleged in their complaint that, for decades, the city had overcharged nonresidential property owners for stormwater utility fees and undercharged other properties, causing appellants "to pay more than their fair share of stormwater system expenses." The district court denied the city's motion to dismiss and certified a class of "[a]ll persons and entities who paid stormwater services fees to the City of Duluth for non-residential structures from September 8, 2015, to the present." Following discovery, the city moved for summary judgment. The district court concluded that the undisputed material facts did not present a genuine question for trial on any of appellants' claims and, as pertinent to this appeal, that appellants' unjust-enrichment and takings claims failed as a matter of law.

This appeal follows.

## ISSUES

I.  Did the district court err in dismissing appellants' unjust-enrichment claim at summary judgment?

II. Did the district court err in dismissing appellants' takings claim at summary judgment?

## ANALYSIS

We review a district court's grant of summary judgment—including a district court's equitable determinations made as a matter of law—de novo. *Montemayor v. Sebright Prods., Inc.*, 898 N.W.2d 623, 628 (Minn. 2017); *Herlache v. Rucks*, 990 N.W.2d

443, 450 n.4 (Minn. 2023). "In doing so, we determine whether the district court properly applied the law and whether there are genuine issues of material fact that preclude summary judgment." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010). "A genuine issue of material fact exists when there is sufficient evidence regarding an essential element to permit reasonable persons to draw different conclusions." *St. Paul Park Refin. Co. v. Domeier*, 950 N.W.2d 547, 549 (Minn. 2020) (quotation omitted); *see also Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 163 (Minn. 2012) ("[I]n order to establish that there is a disputed material fact, the party against whom summary judgment was granted must present specific admissible facts showing a material fact issue." (quotation omitted)). Expert testimony may establish a genuine issue of material fact precluding summary judgment. *Montemayor*, 898 N.W.2d at 628. On appeal from the entry of summary judgment, we view the evidence in the light most favorable to the nonmoving party and resolve any doubts as to the existence of a material fact in that party's favor. *Senogles v. Carlson*, 902 N.W.2d 38, 42 (Minn. 2017).

This appeal also involves interpretation and application of state statute and city ordinances—questions of law we review de novo. *Energy Pol'y Advocs. v. Ellison*, 980 N.W.2d 146, 156 (Minn. 2022); *RDNT, LLC v. City of Bloomington*, 861 N.W.2d 71, 75 (Minn. 2015).

## I.     The district court erred in granting summary judgment on appellants' unjust-enrichment claim.

Appellants argue that the district court erred in dismissing their unjust-enrichment claim at summary judgment. "Unjust enrichment is an equitable doctrine that allows a

plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Herlache*, 990 N.W.2d at 450 (quotation omitted); *see also Hepfl v. Meadowcroft*, 9 N.W.3d 567, 571 (Minn. 2024) ("[T]he law supplies a remedy for unjustified enrichment because such enrichment cannot conscientiously be retained." (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b (Am. L. Inst. 2011))). To succeed on a claim for unjust enrichment, "the plaintiff must show that the defendant was enriched illegally or unlawfully or in a manner that is morally wrong." *Herlache*, 990 N.W.2d at 450 (quotation and citation omitted).

The district court concluded that the city was entitled to summary judgment on the unjust-enrichment claim. According to the district court, the undisputed facts established that the city was not enriched and did not "retain" a benefit by collecting the alleged overcharges because "it still put all of the money into the stormwater utility, which [appellants] received as a benefit." The district court likewise determined that there was no genuine dispute of material fact as to whether the city's retention of stormwater fees was unjust because "[w]hatever was collected paid for the utility's building and operating costs." Appellants argue that they produced sufficient evidence establishing both that the city was enriched and that its enrichment was unjust. We address each argument in turn.

**A.      The district court erred as a matter of law in determining that the city was not enriched by stormwater fee payments.**

Appellants contend that the district court erred as a matter of law in concluding that the city had not been "enriched" because the city did not "retain" the utility fees paid by appellants. The parties do not dispute that the city received a benefit from appellants in

8

the form of money paid to cover the cost of stormwater management. The receipt of a benefit is the essence of the "enrichment" element of an unjust-enrichment claim. *See Hepfl*, 9 N.W.3d at 571 (stating that "mere enrichment"—which occurs when "one party benefits from the efforts or obligations of others"—does not suffice to establish unjust enrichment (quoting *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981))); *Brand & Co. v. Williams*, 13 N.W. 42, 42 (Minn. 1882) (explaining that "[a]n action for money had and received"—the common-law antecedent to unjust enrichment— "can be maintained *whenever one man has received or obtained the possession of the money of another*, which he ought in equity and good conscience to pay over" (emphasis added)); 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (2011) ("A person is enriched if the person has received a benefit."); *Black's Law Dictionary* 670 (12th ed. 2024) (defining "enrichment" as "[t]he receipt of a benefit").

The city was enriched by receiving payments from appellants for stormwater fees. How the city used those fees is not relevant to whether it was enriched through collection of fees. The city's receipt of payments for stormwater fees therefore satisfies the "enrichment" element of an unjust-enrichment claim.

Appellants also argue that the district court engaged in improper fact-finding when it determined that the city did not "retain" any of the alleged overcharges. They point to record evidence demonstrating that a significant portion of the city's budget for stormwater utilities is for "capital improvement" and that such improvements constitute "a benefit retained."

9

We agree that the district court erred in finding that the city had not retained a benefit conferred by nonresidential property owners, but not because the city set aside some portion of its budget for capital improvements. Rather, the city "retained" the stormwater payments because it refused appellants' request for a refund on those payments.[2] *See Herlache*, 990 N.W.2d at 450 ("Unjust enrichment . . . allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." (quotation omitted)); *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. App. 2001) "([T]o establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit."). Moreover, our caselaw does not support a conclusion a claim for unjust enrichment is unavailable if the recipient of a benefit disposes of that benefit following its receipt. And insofar as the district court's order suggests that a plaintiff cannot recover for unjust enrichment as a matter of law when a government defendant uses the benefit conferred to fund public services, that proposition conflicts with caselaw awarding restitution to plaintiffs subjected to excessive or unauthorized utility-related charges. *See Sloan v. City of Duluth*, 259 N.W. 393, 394, 396 (Minn. 1935) (awarding restitution for excessive assessment charges levied to fund utility improvement because the city charged "more than its ordinance permits").

---

[2] Elsewhere in their briefing, appellants argue the same point, explaining that the retention "aspect of unjust enrichment merely relates to the notion that it would be unjust for a wrongfully-enriched party to refuse to give back the benefit they unjustly obtained."

The city argues that there is no enrichment because the city uses stormwater fees only to support the operation of the stormwater utility, which benefited appellants. The city points to *ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, where the supreme court stated that an insurer "did not receive a security interest in [an insured's] home under any cloud of impropriety; nor did what Sentry receive even constitute 'enrichment,' as Sentry paid dollar-for-dollar for what it got." 544 N.W.2d 302, 306 (Minn. 1996). We do not understand this passing reference in *ServiceMaster* to alter the enrichment element in the manner that the city suggests. Indeed, the phrase "paid dollar-for-dollar for what it got" employs the language of equity, referring to the *fairness* of a bargain or exchange, not to whether a benefit was conferred at all.[3]

The city also relies on three cases from the Michigan Court of Appeals to support its argument that it was not enriched. *See Youmans v. Charter Township of Bloomfield*, 969 N.W.2d 570 (Mich. Ct. App. 2021); *Kincaid v. City of Flint*, No. 365646, 2024 WL 1336573 (Mich. Ct. App. Mar. 28, 2024); *Nofar v. City of Novi*, No. 363356, 2024 WL 5148061 (Mich. Ct. App. Dec. 17, 2024). But the outcome in these cases turns on the "unjust" element of an unjust-enrichment claim, not the "enrichment" element, addressing the reasonableness of municipal utility rates and whether the fees charged pursuant to those rates were "excessive." *See Youmans*, 969 N.W.2d at 598-602; *Kincaid*, 2024 WL

---

[3] The supreme court has not subsequently relied upon this construction of "enrichment" set forth in *ServiceMaster*, citing that case only twice since it was decided and for different propositions. And the city's arguments regarding *ServiceMaster*'s brief reference to the "enrichment" element are at odds with the supreme court's more recent discussions of what constitutes "enrichment" for purposes of an unjust-enrichment claim. *See Hepfl*, 9 N.W.3d at 571.

1336573, at *4-5; *Nofar*, 2024 WL 5148061, at *11-13. Whether fees are "excessive" is relevant to the determination of whether the retention of the benefit was justified, not to whether a benefit was received at all. *See Youmans*, 969 N.W.2d at 602 (reversing a restitution award because "plaintiff failed to demonstrate that the Township would be *excessively (and thus unjustly)* enriched by" the retention of water and sewer utility fees (emphasis added)).

We hold that for purposes of a claim of unjust enrichment, a person or entity is enriched upon receipt of a benefit. We therefore conclude that the district court erred as a matter of law when it determined that the city was not enriched through its receipt of the stormwater fees paid by appellants.

**B.      A genuine issue of material fact exists as to whether the city unjustly retained some amount of stormwater utility payments.**

Appellants argue that the district court erred in concluding that there was no genuine dispute of material fact as to whether the city's retention of stormwater utility fees was unjust and that the district court misapplied the law in determining that there was no unjust enrichment. In *Hepfl*, the supreme court acknowledged that "what makes enrichment 'unjust' has proven more challenging to define because it is necessarily case-specific and properly committed to the discretion of the district court." 9 N.W.3d at 571. But *Hepfl* nevertheless reaffirmed that the term "unjust" reflects "two general meanings": (1) a party can be "unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully," and (2) enrichment can be unjust "where it would be morally wrong for one

party to enrich himself at the expense of another." *Id.* (emphasis omitted) (quotations omitted).

In this action, appellants argue that the city was unjustly enriched because its actions are without legal authority. They contend that the city's "stormwater billing methodology and practices violated Minn. Stat. § 444.075 and its City Code," causing appellants to "pay far more than an amount proportionate to the cost to Duluth to provide stormwater services."

Minn. Stat. § 444.075, subd. 1a, authorizes municipalities to construct, operate, and maintain a storm-sewer system. A municipality "may impose just and equitable charges" to fund "the construction, reconstruction, repair, enlargement, improvement, or other obtainment, the maintenance, operation and use" of its stormwater utility. Minn. Stat. § 444.075, subd. 3(a). And the charges imposed "shall be as nearly as possible proportionate to the cost of furnishing the service." *Id.*, subd. 3(b). The statute provides "local government maximum flexibility in financing municipal sewer and water services." *Crown Cork & Seal Co. v. City of Lakeville*, 313 N.W.2d 196, 201 (Minn. 1981); *see also Daryani v. Rich Prairie Sewer & Water Dist.*, No. A05-1200, 2006 WL 619058, at *4 (Minn. App. Mar. 14, 2006) (explaining that "perfect equality in establishing a rate system [compliant with section 444.075] is not expected, nor can quality be measured with mathematical precision," and that "apportionment of utility rates among different classes of users may only be roughly equal"), *rev. denied* (Minn. May 24, 2006).[4]

---

[4] We cite nonprecedential authority for its persuasive value. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).

Appellants argue that they produced sufficient evidence showing that the stormwater utility fees charged to nonresidential properties were "unjust and inequitable" because the city (1) used a flawed methodology to calculate the ERU value resulting in excessive charges, and (2) granted unauthorized "discounts" to itself and other property owners, obligating the city to raise the ERU rate and thereby forcing appellants to pay higher fees than they otherwise would have.

As an initial matter, the parties dispute whether we should afford the same deference to the city's challenged conduct that we traditionally apply to a government body's rate-design decisions. We therefore begin by addressing whether the city's challenged decisions are entitled to judicial deference and then turn to the merits of appellants' arguments.

### 1. The city's rate-design decisions are entitled to judicial deference.

When a government body acts in its "legislative capacity" to set utility rates, its decisions are entitled to judicial deference. *City of Moorhead v. Minn. Pub. Utils. Comm'n*, 343 N.W.2d 843, 846 (Minn. 1984); *see also In re Application by Minn. Power for Auth. to Increase Rates for Elec. Serv.*, 12 N.W.3d 477, 487 (Minn. App. 2024) (*Minn. Power 2024*) (discussing judicial deference afforded to a government entity acting in its legislative capacity to set utility rates), *rev. denied* (Minn. Jan. 21, 2025); *Patti Amanda's Inc. v. City of Biwabik*, No. A21-0680, 2022 WL 351224, at *2, *6-7 (Minn. App. Feb. 7, 2022) (explaining that a city's decisions regarding establishment of utility rates pursuant to section 444.075 constitute a legislative function entitled to "substantial deference"). A government body acts in its legislative capacity when it "allocat[es] costs between utility

14

customers and balanc[es] various factors to achieve a fair and reasonable allocation of these costs." *Moorhead*, 343 N.W.2d at 846. In other words, "rate design decisions . . . are considered a legislative function." *In re Application of Minn. Power for Auth. to Increase Rates for Elec. Serv.*, 838 N.W.2d 747, 760 n.6 (Minn. 2013) (*Minn. Power 2013*) (quotation omitted). And such decisions "are presumed to be just and reasonable and will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable or discriminatory rates by clear and convincing evidence."[5] *Moorhead*, 343 N.W.2d at 846.

Appellants argue that we should not afford deference to the city because this case "is not—and has never been—about ratemaking." They assert that their challenges are limited to "the methodology Duluth uses to set its ERU value to generate stormwater fees, the unlawful discounts it provided to itself and other property owners, and its failure to follow its City Code and Minnesota statutes."

We are unpersuaded by appellants' attempt to distinguish between decisions concerning ERU methodology and ratemaking. A central premise of appellants' argument is that stormwater utility fees for nonresidential properties are tethered to the ERU value. The ERU methodology informs the ERU value, which affects the stormwater fees imposed on nonresidential properties. In short, the ERU value is a critical component of the city's rate design, and therefore the city's determination of the appropriate ERU value is entitled

---

[5] We also note that ratemaking may involve quasi-judicial decisions. *See, e.g.*, *Minn. Power 2013*, 838 N.W.2d at 760 (explaining that utility's establishment of a "reasonable rate of return" is a quasi-judicial function).

to deference. *See Minn. Power 2013*, 838 N.W.2d at 760 n.6 (categorizing rate-design decisions as legislative function); *Minn. Power 2024*, 12 N.W.3d at 496 (explaining that utility's "rate-design decision was a quasi-legislative decision" entitled to judicial deference).

Additionally, while it is true that the ERU value and the ERU rate are distinct concepts, application of a deferential standard of review in the ratemaking context does not turn on whether the government decision under review raises or lowers a given utility rate. Rather, as explained above, deference applies when a government body "acts in its legislative capacity" by "allocating costs between utility customers and balancing various factors to achieve a fair and reasonable allocation of these costs." *Moorhead*, 343 N.W.2d at 846.

The city acted in its legislative capacity in setting stormwater utility fees, including in its ERU-value determination. The undisputed record reflects that the city engaged in an open and deliberative process when it established its approach for determining an appropriate ERU value. It convened a task force of different stakeholders, including private businesses and an environmental engineering firm—CDM—to develop recommendations for the stormwater utility. And it followed CDM's recommendation to classify multifamily properties as dwelling units that figured into the calculation of the ERU value. Because the city acted in its legislative capacity by balancing various factors in seeking to achieve a fair and reasonable allocation of costs, we presume that its choice of ERU methodology and the resulting ERU value is just and reasonable.

16

Appellants' argument that deference is not due to the city's decisions regarding the grant of utility-fee discounts to itself and other property owners is likewise unpersuasive. The core of appellants' argument is that the purported "discounts" required the city to raise the ERU rate to generate sufficient revenue to cover the stormwater utility's budgetary needs. In other words, appellants claim that the ERU rate was higher than it should have been because of the discounts and that they were therefore forced to pay more than their fair share of stormwater expenses. Challenges to the ERU rate and the decisions informing the establishment of that rate implicate the city's rate-design decision that we presume to be just and reasonable. *See Minn. Power 2024*, 12 N.W.3d at 496. We therefore hold that a city acting in its legislative capacity in establishing stormwater utility fees is entitled to judicial deference.[6]

---

[6] The city also argues that "ratemaking law forbids an order of refunds that the legislature has not explicitly authorized." In support of this argument, the city relies primarily on *Peoples Natural Gas Company v. Minnesota Public Utilities Commission*, where the supreme court held that the Minnesota Public Utilities Commission (MPUC) was not authorized to order a public utility to refund charges collected under rates the MPUC had previously declared discriminatory. 369 N.W.2d 530, 531, 535-36 (Minn. 1985). But *Peoples* did not involve a claim for unjust enrichment. In *Peoples*, the supreme court considered whether the MPUC had statutory authority to order such refunds, 369 N.W.2d at 534, not whether a district court sitting in equity could order the disgorgement of charges unjustly retained. In considering a claim for unjust enrichment, the district court has "broad discretion in fashioning remedies." *Herlache*, 990 N.W.2d at 451 (quotation omitted). And in *Herlache*, the supreme court reaffirmed its aversion to "restricting the broad scope of the unjust enrichment remedy, given that the whole point of the action was to relieve against the too narrow procedure of the law." *Id.* (quotation omitted). We therefore reject the city's argument that, in the ratemaking context, a plaintiff cannot recover under a theory of unjust enrichment absent statutory authorization permitting refunds. We also note that the city does not argue that the filed-rate doctrine bars appellants' unjust enrichment claim. *See Hoffman v. N. States Power Co.*, 764 N.W.2d 34, 42-43 (Minn. 2009) (explaining that the filed-rate doctrine applies to challenges that require courts to evaluate the reasonableness of the rate the MPUC has established for a utility and that the doctrine may

That we afford judicial deference in this regard does not immunize the city from challenges to its actions. While the city may be entitled to judicial deference in establishing stormwater utility fees, the law affords appellants the opportunity to overcome that deference. Indeed, the plain language of Minn. Stat. § 444.075, subd. 3(a), limits the city's authority to the imposition of stormwater fees that are "just and equitable," a paradigm that is no different in principle than that traditionally applied in evaluating utility rates established by a government body. When acting in a legislative capacity, ratemaking decisions are presumed to be just and reasonable unless appellants produce clear and convincing evidence that the city, as ratemaker, acted in excess of its statutory authority or that its decisions resulted in unjust, unreasonable, or discriminatory rates. *See, e.g.*, *Moorhead*, 343 N.W.2d at 846.

Having determined that our judicial deference requires that we presume the city's rate-design decisions are just and reasonable, we next consider how that heightened burden of proof impacts the analysis at summary judgment.

### 2. Appellants' evidence at summary judgment must be considered in light of the clear and convincing burden of proof.

The clear and convincing standard refers to appellant's burden *at trial*, not summary judgment. *See Williams v. Curtis*, 501 N.W.2d 653, 656 (Minn. App. 1993) (holding that

---

bar certain claims). And we note that the district court had considered and rejected the city's argument that appellants failed to state a claim upon which relief could be granted under a theory of unjust enrichment. The city did not challenge this determination by the district court on appeal. We also note that the League of Minnesota Cities submitted an amicus brief arguing only for the application of a deferential standard of review to the city's rate-design decisions.

the district court erred by requiring proof of clear and convincing evidence at summary judgment to rebut the presumption of paternity because "[w]hile this is [alleged father's] burden at trial, it is not what is required of [him] on summary judgment"), *rev. denied* (Minn. Aug. 6, 1993). Nevertheless, our precedent makes clear that for purposes of summary judgment, "[w]here the evidentiary standard is mandated, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden.'" *Id.* at 655-56 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). Accordingly, when the ultimate burden of proof at trial is proof by clear and convincing evidence, a district court ruling on a motion for summary judgment must assess whether there is a genuine dispute of material fact in light of that heightened burden. *See Limberg v. Mitchell*, 834 N.W.2d 211, 216-17 (Minn. App. 2013) (collecting cases requiring consideration of clear and convincing burden of proof when evaluating evidence on summary judgment). In *Williams*, we applied this framework and held that, in the context of a paternity action, the alleged father was not required to rebut the presumption of paternity with clear and convincing evidence to withstand summary judgment, and that "[i]t is sufficient that [the alleged father] show the existence of a genuine issue of material fact by evidence that a jury might find clearly and convincingly rebuts the presumption." 501 N.W.2d at 654. We see no principled reason to deviate from this framework to address the issues here. We therefore hold that to withstand summary judgment on an unjust-enrichment claim that challenges municipal stormwater utility fees, a plaintiff must produce evidence that (a) a reasonable fact-finder could conclude clearly and convincingly rebuts the presumption of

19

just and reasonable rate-design decisions and (b) establishes a genuine dispute of material fact as to whether a municipality unjustly retained fees.[7]

Having established that we must afford judicial deference to the city's challenged actions in this case and how that affects our analysis at summary judgment, we next consider the merits of appellants' arguments regarding the ERU value and the allegedly unauthorized discounts.

### 3.      The ERU Value

Appellants argue that they produced sufficient evidence showing that the city's methodology for determining the ERU value is flawed because it includes multifamily properties in calculating the average impervious surface area per dwelling unit.  Appellants contend that the inclusion of multifamily properties departs from industry standards and violates the city code.  And they argue that including multifamily properties deflates the ERU value,[8] thus increasing the fees imposed on nonresidential property owners and rendering the charges unjust and inequitable, in violation of Minn. Stat. § 444.075, subd. 3(a).

---

[7] We note that evidence sufficient to rebut the presumption of just and reasonable rate-design decisions does not necessarily constitute evidence sufficient to prevail on a claim for unjust enrichment.  While we conclude that the production of clear and convincing evidence to rebut the presumption of just and reasonable rate-design decisions is *necessary* to withstand summary judgment on an unjust-enrichment claim, such evidence may not be *sufficient* to defeat summary judgment.  A plaintiff must also present sufficient evidence to demonstrate the existence of a genuine dispute of material fact as to whether a municipality's unlawful, inequitable, or unreasonable rate-design decision resulted in the unjust retention of stormwater fees.

[8] It is undisputed that a lower ERU value necessarily results in higher stormwater charges for nonresidential properties.

Minn. Stat. § 444.075, subd. 3b, sets forth an expansive universe of permissible methods a municipality may use to assess stormwater charges. Under the statute, such charges may be fixed

> (1) by reference to the square footage of the property charged, adjusted for a reasonable calculation of the stormwater runoff; or
> (2) by reference to a reasonable classification of the types of premises to which service is furnished; or
> (3) by reference to the quantity, pollution qualities, and difficulty of disposal of stormwater runoff produced; or
> (4) on any other equitable basis, including any combination of equitable bases referred to in clauses (1) to (3), but specifically excluding use of the basis referred to in subdivision 3a, clause (1);[9] and otherwise without limit.

*Id.*, subd. 3b(1)-(4). The catch-all provision allowing a municipality to fix charges "on any other equitable basis," Minn. Stat. § 444.075, subd. 3b(4), illustrates the "maximum flexibility" afforded to municipalities in setting their utility rates, *see Crown Cork*, 313 N.W.2d at 201.

The city has, since the inception of its stormwater utility, used a combination of the methods set forth in Minn. Stat. § 444.075, subd. 3b, to assess stormwater utility charges. *See* DCC §§ 43-66 (1998), 43-66 (2012), & 43-67 (2020). Pursuant to the city code, the city imposes fees by reference to the classification of the property served and by reference to the amount of impervious surface area on the benefiting property. *See* DCC §§ 43-66(b) (2020). The city therefore acted within its statutory authority—and in conformance with its own code—in imposing fees based on these considerations.

---

[9] Pursuant to Minn. Stat. § 444.075, subd. 3a(1), sanitary sewer charges maybe be fixed "on the basis of water consumed."

Appellants argue that the evidence submitted at summary judgment establishes a genuine issue of material fact as to whether the ERU value resulted in excessive stormwater fees that the city unjustly retained. Appellants point to their expert report by an engineer with experience developing stormwater billing systems for municipalities submitted in opposition to summary judgment. The report concluded that appellants paid "more than their proportionate share for stormwater service" and that such payments were not "just, equitable, or reasonable." Appellants' expert opined that the city's ERU-value methodology was flawed because it included multifamily properties in its ERU-value calculation. According to appellants' expert, including multifamily properties in this calculation was inappropriate because it "violated industry standards."

We are not persuaded by appellants' argument that the city's utility-rate structure is unjust and inequitable because the ERU methodology departs from industry standards. Neither section 444.075 nor the city code requires the city to adhere to industry standards in establishing a rate structure. Thus, the city's deviation from industry standards is not evidence that the city acted outside its statutory authority in developing its own standard for calculating stormwater charges. The assertion by appellants' expert that the city departed from industry standards therefore does not—on this record—amount to evidence that a reasonable fact-finder could conclude clearly and convincingly rebuts the presumption that the city's ERU-value decision was just and reasonable. *See Nofar*, 2024 WL 5148061, at *13 (concluding that expert's assertion that Michigan city violated industry standards did not preclude summary judgment on unjust-enrichment claim because "the city's compliance with industry standards does not speak to whether the water

22

and sewer rates were unreasonable"). Appellants therefore failed to meet their burden to withstand summary judgment with respect to this aspect of their unjust-enrichment claim.

Appellants also argue that the city violated its own code by counting multifamily properties as "dwelling units." The city code defines "dwelling unit" as "[a] single unit that provides complete, independent living facilities for one or more persons including permanent provision for living, sleeping, eating, cooking and sanitation." DCC § 43-65. Appellants contend that "[m]ulti-family properties are, by definition, not a 'single unit,'" and therefore do not fit under the definition of "dwelling unit." But the city adopted its definition of dwelling unit based on CDR's recommendations, and it has consistently interpreted "dwelling unit" to encompass multifamily properties since the utility began operation. We defer to the city's consistent interpretation and application of its own code and conclude that appellants did not meet their burden to present a genuine issue of material fact showing that the city acted in excess of its authority in counting multifamily properties as dwelling units.[10]

Finally, appellants argue that the city violated a provision of the code that states: "The director [of public works and utilities] shall endeavor to investigate and reestablish an ERU value for the city every five years after the effective date of this ordinance." DCC § 43-66(d). But even assuming the city violated this provision, appellants have not presented sufficient evidence to establish a genuine dispute of material fact as to whether

---

[10] Notably, appellants' expert did not assert that the city violated its own code by including multifamily properties under the definition of dwelling unit.

the city's failure to timely reevaluate the ERU value resulted in the city's unjust retention of stormwater fees.

In sum, in affording deference to the city acting in its legislative capacity and given appellants' burden of proof at summary judgment, appellants have not met their burden to establish that the city acted outside its statutory authority in setting the ERU value or that the ERU value resulted in unjust and inequitable charges.

### 4. Stormwater-Fee Discounts

Appellants argue that the city gave unauthorized stormwater-fee discounts to itself and to waterfront and multifamily property owners. They argue that the city was unjustly enriched because imposition of these discounts obligated the city to raise its ERU rate to ensure that it collected sufficient revenue to cover its budgetary needs, effectively requiring appellants to "subsidize" the discounts.

The city code authorizes adjustments on stormwater utility fees under certain circumstances. The original ordinance establishing the utility included a section entitled, "[u]tility fee adjustments." DCC § 43-67 (1998). Pursuant to that section, nonresidential property owners were entitled to apply for a utility-fee adjustment if they believed "the utility fee to be incorrect." *Id.* (a). The city was permitted to grant an adjustment if (1) a substantial error was made in calculating the property's impervious surface area, (2) stormwater runoff from the property never entered "any facility of the stormwater drainage system," or (3) the property utilized "stormwater management practices that significantly improve[d] the quantity or quality" of stormwater runoff. *Id.* (a)(1)-(3). Those provisions remained in effect until 2020, when the city replaced DCC § 43-67(a)(3)

with several other sections providing more guidance on the procedure by which nonresidential property owners could apply for credits. *See* DCC §§ 43-67.1 to 43-67.3 (2020). Put simply, the city code has permitted the stormwater utility to grant adjustments to nonresidential property owners since its inception.

Appellants argue that because the city did not present evidence that the discounts it granted were justified, the city has not established that its discounts were lawful. But it is appellants' burden at summary judgment to establish a genuine issue of material fact through evidence sufficient to overcome the presumption that the city's actions were just and reasonable by clear and convincing evidence. *See Williams*, 501 N.W.2d at 654; *Limberg*, 834 N.W.2d at 216-17; *Moorhead*, 343 N.W.2d at 846. And the absence of evidence relating to the disputed adjustments does not amount to evidence that a reasonable fact-finder might conclude clearly and convincingly rebuts that presumption.

Appellants next argue that the city violated its own code by granting discounts to multifamily properties, obligating the city to raise its ERU rate and thereby forcing appellants to pay more in stormwater fees to "subsidize" the discounts. The city code mandates that "[t]he utility fee for residential property *shall be* the ERU rate multiplied by the number of dwelling units existing on the property." DCC § 43-66(b)(1) (emphasis added). There is evidence in the record that the city has charged less than the full ERU rate and granted discounts to multifamily properties based on the number of stories of a building since at least 2010. For instance, appellants presented evidence showing that, when the ERU rate was set at $6.75, "[r]esidential buildings that [had] 1-4 floors receive[d] a credit of $.75 and a 40% discount." And while the code has always permitted fee

adjustments for *nonresidential* property owners under certain circumstances, it has never explicitly authorized discounts, credits, or adjustments for *residential* property owners. Appellants have therefore established a genuine issue of material fact as to whether the city exceeded its authority and acted unlawfully in granting credits and discounts to multifamily properties.[11]

Our conclusion in this regard is not, by itself, sufficient to require reversal of the grant of summary judgment on the unjust-enrichment claim. Appellants were also required to proffer admissible evidence sufficient to create a genuine issue of material fact as to whether the city's allegedly unlawful conduct resulted in its unjust retention of excessive stormwater fees. *See Doe*, 817 N.W.2d at 163; *Herlache*, 990 N.W.2d at 450. We conclude that appellants met their burden to survive summary judgment. Appellants' expert opined that the city "provided inappropriate credits to multi-family properties," and that the

---

[11] The city does not appear to contest the substance of appellants' argument. Rather, it argues that the issue is not "part of this action" because the complaint did not allege any violations of the statute or city code based on discounts granted to multifamily properties and because appellants did not move to amend their complaint. We disagree. The complaint alleged that the city undercharged and granted unlawful discounts to residential property owners. Specifically, that the city had "overcharged the owners of nonresidential properties . . . and, correspondingly, undercharged the owners of *residential* properties." (Emphasis added.) And specific to the unjust-enrichment claim, appellants alleged that "[i]t is unfair and illegal for the City to refuse to follow its own City Code and to require nonresidential property owners to underwrite the fair share of stormwater service fees owed by *residential* property owners." (Emphasis added.) Under Minnesota's liberal notice-pleading standard, these allegations are sufficient to put the city on notice as to appellants' claim and the nature of their argument. *See Demskie v. U.S. Bank Nat'l Ass'n*, 7 N.W.3d 382, 387 (Minn. 2024) ("[T]he Minnesota pleading standard requires only information sufficient to fairly notify the opposing party of the claim against it, with a focus on the underlying incident rather than on the specific facts of the incident." (quotations omitted)). And appellants briefed this argument at summary judgment, thus preserving the issue for appeal.

discounts "increased the cost paid by non-residential customers each year." Specifically, appellants' expert asserted that the discounts to multifamily properties "increased the cost to commercial/industrial customers" by approximately $155,037 in 2015, and by approximately $199,396 in 2021. Viewing the evidence in the light most favorable to appellants, we conclude that appellants have proffered evidence that a reasonable fact-finder could find clearly and convincingly rebuts the presumption of just and reasonable rate-design decisions. And we conclude that this evidence establishes a genuine issue of material fact as to whether the city unjustly retained the benefit of excessive stormwater fees charged as a result of the allegedly unlawful discounts granted to multifamily properties.

We emphasize that we express no opinion as to whether appellants have established that the discounts resulted in unjust enrichment to the city, and that such a determination is within the exclusive province of the district court, as the fact-finder on this equitable claim. We merely conclude that appellants have proffered sufficient evidence to establish the existence of a genuine issue of material fact as to whether the city unjustly retained allegedly excessive stormwater fees through evidence that a reasonable fact-finder *could* conclude clearly and convincingly rebuts the presumption of just and reasonable rate-design decisions. On remand, the city is entitled to present evidence to rebut appellants' claims that the discounts resulted in an unlawful increase of the ERU rate or otherwise resulted in unjust enrichment. Ultimately, the district court must make factual findings, weigh the equities, and determine whether equitable relief is warranted. *See Hepfl*, 9

N.W.3d at 572 ("[W]hat makes enrichment 'unjust' . . . is necessarily case-specific and properly committed to the discretion of the district court.").

## II. The district court properly dismissed appellants' takings claim.

Appellants argue that the district court erred by dismissing their takings claim at summary judgment. The Minnesota Constitution prohibits the taking of private property for public use without just compensation. Minn. Const. art. I, § 13. "The purpose of the Takings Clause is to ensure that the government does not require some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 632 (Minn. 2007) (quotations omitted). Whether a government body's action amounts to a taking is a question of law that we review de novo. *Minn. Sands, LLC v. County of Winona*, 940 N.W.2d 183, 200 (Minn. 2020).

The district court concluded that "the City is providing a service—specifically a stormwater sewer utility—which provides the 'just compensation' for the taking of [appellants'] money." The district court also observed that appellants' "theory would be a new and unusual application of the takings clause," and that a "takings case is more commonly used when a governmental entity needs land for a road or other building project and takes it from a private landowner."

Appellants characterize the basis of the district court's decision as a rejection of appellants' theory that they "have a property interest in their own money." They assert that the district court erroneously "adopted [the city's] position at summary judgment—that the class had no protected property interest in its money." But the district court did not

28

explicitly adopt the city's position in this regard, nor does the district court's order speak to the issue of whether the stormwater fees paid by appellants constituted property under the Takings Clause. Instead, the district court denied the takings claim because it concluded that appellants had received just compensation for their payments through the provision of stormwater utility services. And as the city points out, appellants do not challenge this basis for dismissal. We nevertheless analyze the issue as framed by appellants.

The United States Supreme Court has observed that the Takings Clause in the federal constitution "does not itself define property." *Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023).[12] To determine whether something is "property" under the Takings Clause, "the Court draws on existing rules or understandings about property rights," including state law, traditional property-law principles, historical practice, and Supreme Court precedent. *Tyler*, 598 U.S. at 638 (quotation omitted).

Both the United States Supreme Court and the Minnesota Supreme Court have concluded that, under certain circumstances, imposition of an obligation to spend money can constitute a taking. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013) (rejecting the argument that "an obligation to spend money can never provide the basis for a takings claim"); *Johnson v. City of Eagan*, 584 N.W.2d 770, 772 (Minn.

---

[12] Because "the Takings Clause in the Minnesota Constitution is similar to the Takings Clause in the U.S. Constitution," we look to decisions interpreting the Takings Clause of the federal constitution to inform our interpretation of Minnesota's Takings Clause. *Wensmann*, 734 N.W.2d at 631-32.

1998) (concluding that the imposition of a special-assessment fee that had already been "judicially disallowed" amounted to "an unconstitutional taking of private property").

But the United States Supreme Court has also made clear that taxes and government-imposed user fees do not constitute takings. *See Koontz*, 570 U.S. at 615 ("It is beyond dispute that taxes and user fees are not takings." (quotations omitted)); *United States v. Sperry Corp.*, 493 U.S. 52, 62-63 (1989) (holding that "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services" but noting that if a monetary obligation characterized as user fee was "so clearly excessive as to belie [its] purported character as" a user fee, then it might amount to a taking). And in a recent nonprecedential opinion, we rejected the argument that the imposition of fees for a government-provided service amounted to a taking, relying on *Koontz* for the proposition that "user fees do not exact a 'taking' under the constitution." *Hous. First Minn. v. City of Corcoran*, No. A23-1049, 2024 WL 1244047, at \*5 (Minn. App. Mar. 25, 2024), *rev. denied* (Minn. June 26, 2024), *cert. denied*, 145 S. Ct. 381 (2024). Because the stormwater charges were user fees "imposed for the reimbursement of the cost of government services," they do not constitute a taking under the Minnesota Constitution. *See Sperry*, 493 U.S. at 63.

## DECISION

We hold that for purposes of a claim of unjust enrichment, a person or entity is enriched upon receipt of a benefit. The district court erred as a matter of law in concluding that no enrichment occurred because the undisputed facts establish that the city received a benefit through appellants' payment of stormwater utility fees. We hold that a city acting

in its legislative capacity in establishing stormwater utility fees is entitled to judicial deference. And we hold that to withstand summary judgment on an unjust-enrichment claim that challenges municipal stormwater utility fees, a plaintiff must produce evidence that (a) a reasonable fact-finder could conclude clearly and convincingly rebuts the presumption of just and reasonable rate-design decisions and (b) establishes a genuine dispute of material fact as to whether a municipality unjustly retained fees.[13]

We conclude that appellants have proffered sufficient evidence to establish a genuine issue of material fact as to whether the city unjustly retained the benefit of excessive stormwater fees charged as a result of the allegedly unlawful discounts granted to multifamily property owners by evidence that a reasonable fact-finder could conclude clearly and convincingly rebuts the presumption of just and reasonable rate-design decisions. But we conclude that appellants failed to meet their burden of proof with respect to their remaining theories of recovery in unjust enrichment against the city. And we discern no error in the district court's summary-judgment dismissal of appellants' takings claim. We therefore reverse and remand for further proceedings on the unjust-enrichment claim consistent with this opinion.

**Affirmed in part, reversed in part, and remanded.**

---

[13] Our holdings are limited to challenges to municipal utility fees and do not apply to utility rates approved by the MPUC, which are governed by separate authorities.

31